CARDER BUICK-OLDS COMPANY., INC., Appellant,

v.

REYNOLDS & REYNOLDS, INC., Appellee.

[Cite as *Carder Buick–Olds Co. v. Reynolds & Reynolds, Inc.*, 148 Ohio App.3d 635, 2002-Ohio-2912.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 19114.

Decided June 14, 2002.

636

Richard S. Wayne, William K. Flynn, Steven F. Stuhlbarg and Joseph J. Braun, for appellant.

Mary L. Wiseman, Ronald I. Raether, Jr., and Daniel H. Binegar, for appellee.

---

Brogan, Judge.

{¶ 1} Plaintiff-appellant, Carder Buick–Olds ("Carder") is an automobile dealership located in Searcy, Arkansas. From 1980 to 1990, Carder used a computer system purchased from Reynolds & Reynolds ("Reynolds"). In 1990, Carder replaced this system with one from Convergent Dealership Systems. At the time Carder purchased the Convergent system, it signed a sales and license agreement that included a contract for maintenance and support of the system. Sometime after 1990, COIN Dealership Systems bought out Convergent and assumed responsibility for the maintenance and support of all of its customers. Then in 1993, Reynolds acquired COIN, assuming the same responsibilities.

{¶ 2} On August 18, 1993, shortly after Reynolds acquired COIN, the COIN Automobile Advisory Council ("CADAC") sent a letter to all dealerships that were currently using a COIN system, addressing the impact of Reynolds's acquisition. This letter stated the following:

{¶ 3} "Reynolds has no plans to force any dealer to invest in new equipment. Reynolds representatives will work with dealership management to insure that their current system is meeting their business and information management needs.

{¶ 4} "Reynolds and Reynolds will continue to keep COIN products up-to-date and current for manufacturer and government dictated changes and obviously will correct any problems. Reynolds'[s] experience has shown that some desired enhancements may be beyond the technical limitations of older technology platforms."

{¶ 5} Thereafter, Reynolds continued to provide maintenance and support for Carder's system.

{¶ 6} In October 1997, Reynolds sent letters to all customers who were still using a COIN system, which included 707 dealerships. Reynolds's letter advised customers that a Y2K issue existed with the COIN system that would cause problems within the computer when dates after December 31, 1999, were input. In addition, the letter explained that the COIN system was incapable of integrating upcoming manufacturer initiatives. As a result, Reynolds had decided to "end-of-life" all of the COIN systems. This included terminating maintenance and support for all COIN systems as of December 31, 1998, thereby requiring all current customers to obtain a new computer system.

{¶ 7} Carder continued to pay for and receive maintenance and support for its COIN system through December 31, 1998. At that time, it was forced to obtain a new system. While Carder did consider a Reynolds replacement system, it instead purchased its new computer system through another company.

{¶ 8} After reviewing discovery obtained from Reynolds, Carder discovered that of the 707 dealerships that received the October 1997 letter, at least 424 of them were parties to a Convergent or COIN Dealership Systems sales and license agreement containing the same material terms and conditions as Carder's agreement. Accordingly, Carder sought to certify a class consisting of the following:

{¶ 9} "All persons or entities who were parties to a Convergent Dealership Systems Sales License & Maintenance Agreement or a COIN Dealership Systems Sales License & Maintenance Agreement and continued to pay Reynolds & Reynolds maintenance or software fees for their automobile dealership management system, including its associated hardware and/or software as of October 1997."

{¶ 10} Reynolds opposed certification, contending that a large portion of this class has maintained a business relationship with Reynolds, and therefore, Carder could not adequately represent the class. In addition, Reynolds claimed that the

relationship of the parties to each contract would need to be individually analyzed to determine the distinct negotiation and amendments that apply to each individual dealership's agreement. As a result, Reynolds believed that a class action was not the superior method of pursuing this litigation.

{¶ 11} The magistrate and trial court agreed with Reynolds and denied class certification. Carder then timely appealed, raising the following assignments of error:

{¶ 12} "I. The trial court erred by finding that a conflict exists between Carder and some members of the proposed class that prevents Carder from adequately representing the class.

{¶ 13} "II. The trial court erred by finding that common issues of fact and law do not predominate in this action.

{¶ 14} "III. The trial court erred by finding that a class action is not superior to other methods of adjudication."

{¶ 15} Initially, we note that the standard of review in this case is well established. "A trial judge has broad discretion in determining whether a class action may be maintained and that determination will not be disturbed absent a showing of an abuse of discretion." *Baughman v. State Farm Mut. Auto. Ins. Co.* (2000), 88 Ohio St.3d 480, 483, 727 N.E.2d 1265. Abuse of discretion is typically defined as an attitude that is unreasonable, arbitrary or unconscionable. *AAAA Enterprises, Inc. v. River Place Comm. Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597. However, an abuse of discretion commonly generates a decision that is unreasonable rather than arbitrary or unconscionable. Id. In this case, we find that the trial court's reasoning process did not support its decision denying Carder's motion to certify a class. Id.

{¶ 16} The purpose for this standard is based on a trial court's "special expertise and familiarity with case-management problems and its inherent power to manage its own docket." *Hamilton v. Ohio Sav. Bank* (1998), 82 Ohio St.3d 67, 70, 694 N.E.2d 442. Therefore, a finding of abuse of discretion should be made cautiously, particularly where a trial court has denied certification. *Marks v. C.P. Chem. Co.* (1987), 31 Ohio St.3d 200, 201, 31 OBR 398, 509 N.E.2d 1249.

{¶ 17} Nevertheless, any doubts a trial court may have as to whether the elements of class certification have been met should be resolved in favor of upholding the class. *Baughman,* 88 Ohio St.3d at 487, 727 N.E.2d 1265. As a result, it is not uncommon for a reviewing court to reverse a trial court's denial of class certification. In 1998, the Supreme Court in two separate cases found the trial court had abused its discretion in denying class certification. See *Hamilton,* 82 Ohio St.3d 67, 694 N.E.2d 442; *Cope v. Metro. Life Ins. Co.* (1998), 82 Ohio St.3d 426, 696 N.E.2d 1001. In *Hamilton,* mortgagors brought an action against

a bank, alleging claims arising out of identical or similar form contracts. The Supreme Court found that "[t]his appears to present the classic case for treatment as a class action," and then cited many cases that had been similarly certified. *Hamilton*, 82 Ohio St.3d at 80, 694 N.E.2d 442. The court acknowledged that issues involving separate contractual situations presented special problems. However, the court also found that had the legislature intended to exclude contractual situations from class action relief, it would have said so. Id. at 83, 694 N.E.2d 442.

{¶ 18} The *Cope* plaintiffs brought an action against MetLife alleging that it failed to abide by administrative regulations requiring insurance companies to provide written disclosure warnings to customers purchasing replacement life insurance. *Cope*, 82 Ohio St.3d at 433, 696 N.E.2d 1001. Again, the Supreme Court said that it could not imagine a case more suited for class action treatment, because the claims involved the use of form documents, standardized practices and procedures, and common omissions. Id. at 437, 696 N.E.2d 1001.

{¶ 19} Pursuant to Civ.R. 23(A), a plaintiff must satisfy seven requirements in order to maintain a class action: (1) an identifiable class must exist and the definition of the class must be unambiguous, (2) the named representatives must be members of the class, (3) the class must be so numerous that joinder of all members is impracticable (numerosity), (4) there must be questions of law or fact common to the class (commonality), (5) the claims or defenses of the representative parties must be typical of the claims or defenses of the class (typicality), (6) the representative parties must fairly and adequately protect the interests of the class (adequacy), and (7) one of the three Civ.R. 23(B) requirements must be met. *Hamilton*, 82 Ohio St.3d at 71, 694 N.E.2d 442.

{¶ 20} Civ.R. 23(B)(3) requires that the court find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members [predominance], and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy [superiority]." The trial court found that Carder had satisfied the first five elements outlined above, but had not provided sufficient evidence to show adequacy, predominance or superiority.

{¶ 21} In contrast to the trial court's decision, Carder claims that all seven elements have been satisfied. The three elements found by the trial court to be deficient represent Carder's three assignments of error.

## I.  Adequacy

{¶ 22} The trial court found that Carder could not adequately represent the class primarily because Carder is a former customer of Reynolds, and other potential class members are current customers. After the COIN products were

end-of-lifed, approximately 73.9 percent of the customers replaced their COIN system with another Reynolds product. The trial court found that this distinction rendered Carder an inadequate class representative. We disagree.

{¶ 23} A class representative is considered adequate as long as its interest is not antagonistic to the interest of other class members. *Hamilton,* 82 Ohio St.3d at 77–78, 694 N.E.2d 442. To support its contention that Carder's interest is antagonistic to those potential class members who remain Reynolds's customers, Reynolds relies mainly on *Shaver v. Std. Oil Co.* (1990), 68 Ohio App.3d 783, 589 N.E.2d 1348.

{¶ 24} In *Shaver,* the plaintiff was a former independent dealer/lessee of defendant, Standard Oil. Shaver sought to represent a class consisting of both former and present independent dealers of Standard Oil in a suit for violation of Ohio's Valentine Act and Consumer Sales Practices Act, as well as breach of fiduciary duty and interference with business relationships. Id. at 788, 589 N.E.2d 1348. The court found that because Shaver was a former dealer and many potential class members were current dealers, Shaver could not adequately represent the entire class. Id. at 795–96, 589 N.E.2d 1348. Generally, the court held that current dealers would be interested in the economic viability of the business and in maintaining an amicable relationship, whereas the class representative, a former dealer, would not.

{¶ 25} The *Shaver* court cited several federal court opinions that supported this holding. Id., 68 Ohio App.3d at 796, 589 N.E.2d 1348. After reviewing these cases, we find that the relationship between the parties in each case was similar to the relationship in *Shaver,* i.e., either lessor/lessee or franchiser/franchisee. See *McMahon Books, Inc. v. Willow Grove Assoc.* (E.D.Pa.1985), 108 F.R.D. 32 (tenants versus mall owner); *S. Snack Foods v. J & J Snack Foods Corp.* (D.C.N.J.1978), 79 F.R.D. 678 (franchisee/distributor versus franchisor); *Aamco Automatic Transmissions, Inc. v. Tayloe* (E.D.Pa.1975), 67 F.R.D. 440 (franchisee versus franchisor); *McCoy v. Convenient Food Mart, Inc.* (N.D.Ill.1975), 69 F.R.D. 337 (franchisee versus franchisor); *Matarazzo v. Friendly Ice Cream Corp.* (E.D.N.Y.1974), 62 F.R.D. 65 (employee versus employer); *DiCostanzo v. Hertz Corp.* (D.C.Mass.1974), 63 F.R.D. 150 (franchisee versus franchisor); *Thompson v. T.F.I. Cos., Inc.* (N.D.Ill.1974), 64 F.R.D. 140 (franchisee versus franchisor); *McMackin v. Schwinn Bicycle Co.* (N.D.Ill.1973), 21 Fed.R.Serv.2d 1306, 1973 WL 912 (franchisee versus franchisor).

{¶ 26} The relationships found in all of these cases are not the same as the customer relationship in the present case. A franchisee and franchisor or employee and employer have a relationship in which the former literally depends on the economic viability of the latter to sustain its existence. This is not true for a customer/seller or service/provider relationship. See *Hi–Co Ent., Inc. v.*

*ConAgra, Inc.* (D.C.Ga.1976), 75 F.R.D. 628, 631, citing *Free World Foreign Cars, Inc. v. Alfa Romeo* (S.D.N.Y.1972), 55 F.R.D. 26, 29. If a large judgment affected Reynolds's viability, the only impact on current customers would be a need to find another company to provide maintenance and support for their computer systems. A judgment would not directly affect customers' own viability. While current customers may understandably desire to maintain an amicable relationship with a service provider, absence of such a relationship would not be detrimental to their very existence. Accordingly, we find *Shaver* distinguishable.

{¶ 27} Furthermore, even though the *Shaver* court found that the plaintiff could not adequately represent both former and present dealers, the court did not agree that this reason was sufficient to deny class certification entirely. Instead, the court listed several other options, such as redefining the class, permitting current dealers to join the class, or limiting the certification. *Shaver*, 68 Ohio App.3d at 796, 589 N.E.2d 1348. In fact, the Sixth District found that the trial court abused its discretion by denying class certification without considering alternative means to certify the class. Id. at 800, 589 N.E.2d 1348.

{¶ 28} Reynolds further relies on our case of *Davis v. Kettering* (Mar. 13, 1987), Montgomery App. No. 9704, 1987 WL 7869, to support its allegation that Carder's interests are antagonistic to the interests of other class members. *Davis* involved a potential class of landowners who sued the city of Kettering for developing land in such a way to cause excessive water to flow into a ditch, which damaged properties along the ditch. The court found that there was a real possibility of antagonism within the potential class because some landowners had built encroachments to protect their land from the excess water. Id. at 4–5. These encroachments could have caused erosion on other property upstream and downstream that was owned by other potential class members. Moreover, at least one landowner testified at a hearing that if other landowners' actions had caused additional damage to his property, their ability to represent him in a class action would be affected. Id. at 5. There is no such existing antagonism between Carder and the other potential class members.

{¶ 29} Aside from the former-/present-customer distinction raised by Reynolds, the only other potential antagonism mentioned was Carder's general enmity toward Reynolds, based on past experience. Specifically, between 1980 and 1990, Carder used a Reynolds computer system in its business. During this time period, disputes arose between the two companies. Carder claims they were resolved amicably; Reynolds alleges that Carder threatened a lawsuit. Regardless of which version is true, we do not find this relevant to whether Carder could adequately represent the class in this lawsuit. As long as there is no antagonism between class members involved in the present situation, Carder's past relationship or feelings toward Reynolds have no relevance.

{¶ 30} Moreover, if any of the above issues cause potential class members to doubt Carder's ability to adequately represent the class, they may opt out of the class pursuant to Civ.R. 23(C)(2)(a). Based on the foregoing, we disagree with the trial court's finding that Carder would not be an adequate representative of the class. The first assignment of error is, therefore, sustained.

## II. Predominance

{¶ 31} Once all the elements in Civ.R. 23(A) have been satisfied, a plaintiff must comply with one of the three subdivisions of Civ.R. 23(B). In this regard, Carder alleges that it has satisfied Civ.R. 23(B)(3). The requirements of this rule can be divided into two subparts: predominance and superiority. The trial court found that Carder had not satisfied either of these requirements. Notably, the Supreme Court has held that if all of the elements of Civ.R. 23(A) have been fulfilled, certification should not be denied based on an overly narrow construction of Civ.R. 23(B)(3). *Ojalvo v. Bd. of Trustees of Ohio State Univ.* (1984), 12 Ohio St.3d 230, 235, 12 OBR 313, 466 N.E.2d 875.

{¶ 32} When considering the predominance requirement, the Supreme Court has found that it will be satisfied " 'when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position.' " *Baughman,* 88 Ohio St.3d at 489, 727 N.E.2d 1265, quoting *Lockwood Motors, Inc. v. Gen. Motors Corp.* (D. Minn. 1995), 162 F.R.D. 569, 580. Moreover, for common questions of fact or law to predominate, it is not sufficient that they merely exist. *Marks,* 31 Ohio St.3d at 204, 31 OBR 398, 509 N.E.2d 1249. Instead, they must represent a significant aspect of the case and be capable of resolution for all members of the class in a single adjudication. Id.

{¶ 33} Carder has advanced two claims against Reynolds: breach of contract and fraud. We must address each claim separately to determine if common questions predominate.

{¶ 34} In the breach-of-contract claim, Carder alleges that Reynolds breached the agreement that provided for maintenance and support of the computer system. In October 1997, Reynolds sent a letter to all customers who were currently using a COIN system, advising them that Reynolds was going to terminate their maintenance and support as of December 31, 1998. Steven Stuhlbarg, an attorney for Carder, has alleged in an affidavit that he reviewed Reynolds's files and determined that Reynolds sent this letter to 707 dealerships. After examining as many customer files as Reynolds could provide, Stuhlbarg found that 424 dealership contracts contained terms and conditions identical to those in Carder's contract.

{¶ 35} In response, Reynolds alleges that it had many different contracts for many distinct types of hardware and software. Specifically, Charles Schroeder of Reynolds submitted an affidavit alleging that the company's files contained at least 19 different contracts with COIN users, which had diverse terms and conditions. However, the affidavit did not discuss how many of these different contracts described were still in effect in October 1997, when the termination letter was sent. The affidavit also did not indicate how many different types of contracts were affected by the letter. Moreover, many of the differences pointed out in the contracts are irrelevant, i.e. warranty issues, length of service, emergency services. Finally, we note that the Supreme Court has even upheld class certification in situations where several different contracts were involved. *Ojalvo*, 12 Ohio St.3d at 235, 12 OBR 313, 466 N.E.2d 875. Because Schroeder's affidavit does not directly contradict Stuhlbarg's by narrowing his discussion to only those contracts affected by the October 1997 letter, we do not find Schroeder's affidavit helpful in resolving this issue.

{¶ 36} In the alternative, Reynolds argues that while the initial contract language may be identical, many contracts were amended based on negotiations between the parties. In response, Carder contends that there was no negotiation involved with these contracts; instead they were contracts of adhesion drafted by Reynolds. Consequently, Carder argues, there is no relevant extrinsic evidence to consider.

{¶ 37} After reviewing the depositions and affidavits submitted by the parties, we find that Carder's own contract was amended from the original language. Presumably through negotiation, Carder's contract allowed the initial fee for maintenance and support to remain unchanged for an extended term of 66 months. While we agree this is a contract amendment, it is not pertinent to the claim alleged in this case, i.e., that Reynolds breached the contract by refusing to repair a known defect in the system. The length of time Carder could maintain the maintenance fee without increase is irrelevant to this issue. Again, the affidavit about the 424 contracts with identical terms is the only information that directly addresses the relevant contract language for customers who were sent the October 1997 letter.

{¶ 38} Reynolds further claims that even if language in the relevant contracts is identical, the language is ambiguous. Therefore, extrinsic evidence is necessary to establish the meaning. This argument assumes, of course, that an inquiry into extrinsic evidence would cause individual issues to outweigh common issues. We should point out that generally, courts should not decide the merits of an action when determining the propriety of class certification. *Eisen v. Carlisle & Jacquelin* (1974), 417 U.S. 156, 177–178, 94 S.Ct. 2140, 2152–2153, 40 L.Ed.2d 732, 748–749; *Ojalvo*, 12 Ohio St.3d at 233, 12 OBR 313, 466 N.E.2d 875.

However, courts may analyze essential elements of substantive claims to determine if the requirements of Civ.R. 23 have been met. *McClendon v. Continental Group, Inc.* (D.N.J.1986), 113 F.R.D. 39, 44. In the present case, the trial court implicitly decided that the contract was ambiguous and extrinsic evidence would be required to establish the meaning for each individual customer. Because this determination was made below, we also must address whether the contract is ambiguous and whether extrinsic evidence would need to be examined.

{¶ 39} Generally, courts presume that the parties' intent has been embodied in the contract language. *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph one of the syllabus. In fact, in a contract action where the language is unambiguous, the agreement is controlled by the writing. See, e.g., *Holznagel v. Charter One Bank* (Dec. 14, 2000), Cuyahoga App. No. 76822, at 6, 2000 WL 1844780. It is well established that extrinsic evidence should only be considered when contract language is ambiguous. *Kelly,* 31 Ohio St.3d at 132, 31 OBR 289, 509 N.E.2d 411. "The subjective understanding of a party to an objectively unambiguous written contract will not change the terms of the contract." *Holznagel,* Cuyahoga App. No. 76822, at 6, citing *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 246, 7 O.O.3d 403, 374 N.E.2d 146. Moreover, "[t]he fact that a party did not understand or had an understanding different than that contained in the writing cannot change the writing." Id. Therefore, no further inquiry would be appropriate.

{¶ 40} In this case, however, Reynolds contends that the contract language is ambiguous. Thus, the trial court would need to look at extrinsic evidence specific to each dealership in order to determine if the Y2K defect should be covered under the contract. We do not agree. The relevant contract language is as follows:

{¶ 41} "CDS's maintenance service hereunder shall keep the equipment in operating condition, unless maintenance services are terminated by Customer pursuant to Section 2(b) and 8(a). This service shall include remedial and preventive maintenance and replacement of parts."

{¶ 42} After reviewing this language, we find it to be general, but not ambiguous. The contract requires Reynolds to keep Carder's computer in operating condition, which includes preventive and remedial maintenance. The question then is whether correcting the Y2K defect would be covered by this language. We do not find that the contract language is ambiguous simply because the trial court would need to decide if certain activity was covered under the contract. This task is required of a trial court in any breach-of-contract action.

{¶ 43} In any event, there is no extrinsic evidence that would assist in resolving whether correction of the Y2K defect is covered under the contract.

Y2K problems were not even contemplated when these contracts were drafted and entered into. Consequently, any examination of individualized extrinsic evidence at the time the contracts were formed would be futile.

{¶ 44} Furthermore, as discussed previously, the contract language is identical for at least 424 dealerships. Because this language is identical, specific terms were obviously not negotiated. Instead, at least the relevant portion of the contracts can be considered "form" or "adhesion" sections drafted by Reynolds with no input from dealerships. In view of these facts, the trial court must decide at trial whether Reynolds was required to correct the Y2K defect based on the contract itself and possibly what Reynolds intended the language to include. While Reynolds did not contemplate the Y2K defect, its view of the types of problems encompassed by the contract at that time could be helpful in determining whether a Y2K defect should be similarly covered.

{¶ 45} Because we find that the identical contract language is unambiguous and that extrinsic evidence is unnecessary, we believe this case should be treated like other cases involving form contracts. In this regard, claims involving interpretations of form contracts present the classic case for treatment as a class action, and breach-of-contract cases are routinely certified as such. See, e.g., *Baughman*, 88 Ohio St.3d at 490, 727 N.E.2d 1265; *Hamilton*, 82 Ohio St.3d at 80, 694 N.E.2d 442; *Cope*, 82 Ohio St.3d at 430, 696 N.E.2d 1001.

{¶ 46} Based on the foregoing discussion, we find that the maintenance and support contract is not ambiguous. Therefore, no extrinsic evidence should be considered in determining whether Reynolds breached the contract. Because the contract language is identical, and individualized extrinsic evidence need not be examined for each dealership, the question of whether the contract was breached is common to all members of the class. Accordingly, the trial court abused its discretion in finding that the predominance issue was not satisfied for the breach-of-contract claim.

{¶ 47} Next, we must address whether the fraud claim raised by Carder satisfies the predominance element. Generally, courts have found that when a common fraud is perpetrated on a group of plaintiffs, those plaintiffs should be able to pursue the claim without focusing on questions affecting individual members. *Cope*, 82 Ohio St.3d at 430, 696 N.E.2d 1001. In this regard, fraud cases that involve a single underlying scheme and common misrepresentations or omissions across the class are particularly subject to common proof. Id. at 432, 696 N.E.2d 1001. Once the plaintiff establishes that there are common misrepresentations or omissions affecting all class members, a class action can be certified notwithstanding the need to prove reliance. *Hamilton*, 82 Ohio St.3d at 83–84, 694 N.E.2d 442.

{¶ 48} Furthermore, direct evidence is not necessary to establish inducement and reliance. Instead, these elements of fraud can be established by inference or presumption. *Baughman,* 88 Ohio St.3d at 490–91, 727 N.E.2d 1265. Courts have generally found that because inducement and reliance can be inferred from common proof of misrepresentations or omissions, the need for individual proof is obviated. See, e.g., *Cope,* 82 Ohio St.3d at 436, 696 N.E.2d 1001. Even if specialized inquiries into reliance were necessary, this should not defeat class certification. *Portman v. Akron Sav. & Loan Co.* (1975), 47 Ohio App.2d 216, 219, 1 O.O.3d 287, 353 N.E.2d 634. Therefore, a case involving a common scheme across the entire class should be certified as a class action notwithstanding the need for each class member to prove inducement and reliance. Id.

{¶ 49} The *Baughman* court explained that presumptions are appropriate where direct proof is rendered difficult. *Baughman,* 88 Ohio St.3d at 490, 727 N.E.2d 1265. In the present case, requiring plaintiffs to speculate on how they would have reacted if material information had been disclosed or if misrepresentations had not been made " 'would place an unnecessarily unrealistic evidentiary burden on the * * * plaintiff.' " Id. at 491, 727 N.E.2d 1265, quoting *Basic, Inc. v. Levinson* (1988), 485 U.S. 224, 245, 108 S.Ct. 978, 99 L.Ed.2d 194. Therefore, if plaintiffs could establish by common proof that Reynolds made a material misrepresentation or withheld required information, a presumption of reliance could arise. On the other hand, the Supreme Court has said that "if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed," the case may not be suited for class action. *Cope,* 82 Ohio St.3d at 430, 696 N.E.2d 1001.

{¶ 50} After reviewing the briefs and the pleadings below, Carder appears to have alleged that two courses of conduct by Reynolds constituted fraud. First, Carder claims that Reynolds knew about the Y2K defect and had no intention of correcting it. Nonetheless, Reynolds continued to collect monthly maintenance and support payments from COIN users for two to three more years. This claim alleges fraud by omission. Carder claims that Reynolds's omission of failing to alert COIN users of a defect it did not intend to repair is a common issue across the entire class. Because the omission is common, the inducement to continue to pay the fees and reliance that Reynolds would provide maintenance and support can be inferred across the class. We agree with this argument.

{¶ 51} While we realize that plaintiff has the burden to prove the elements of fraud, we do not believe individualized evidence would be necessary to prove this omission. The evidence would only need to show that Reynolds (1) knew about the defect, (2) was required to repair the defect but did not intend to do so, (3) did not reveal this knowledge or requirement to the dealerships, and (4) continued to charge dealerships their monthly maintenance fees. Reynolds's records

would indicate whether the dealerships continued to pay for maintenance and support pursuant to their contracts at least until they received the October 1997 letter that maintenance and support would be terminated in 1998.

{¶ 52} Furthermore, there is evidence in the record that Reynolds was aware of the Y2K defect as early as 1994. However, the record does not contain evidence that any potential class members knew before October 1997 that their maintenance and support would be terminated without correction of the Y2K defect. We find that most if not all of this evidence can commonly be determined for all dealerships. Therefore, based on the case precedent, inducement to continue to pay the fees, and reliance that Reynolds would continue to keep their systems in operating condition could also be inferred. This inference would substitute for requiring representatives from each dealership to speculate on the stand whether they would have continued to pay maintenance and support fees if they knew their systems had a defect that Reynolds did not intend to repair.

{¶ 53} Carder's second fraud claim is that Reynolds promised COIN customers that it would continue to maintain and support their systems and would not require replacement with a Reynolds system. According to Carder's original motion to certify the class and oral argument, this claim is based on a letter sent by CADAC to all Reynolds customers who used a COIN system at the time Reynolds acquired COIN. This letter published assurances that Reynolds made to CADAC regarding its intention to continue to support the COIN systems and to not require COIN users to purchase new Reynolds systems. Carder argues that this promise was made with a present intention not to perform, because Reynolds knew it would ultimately terminate the maintenance agreements on COIN systems.

{¶ 54} Carder has alleged that this letter was sent to all members of the class. Again, if the misrepresentation was contained in an identical letter sent to all class members, it is susceptible of prove the misrepresentation across the board, inducement and reliance can also be inferred, obviating the necessity for individual proof. See *Cope*, 82 Ohio St.3d at 436, 696 N.E.2d 1001. As with the fraud-by-omission claim, this presumption would relieve each dealership of the need to speculate whether it would have continued its relationship with Reynolds if it knew Reynolds intended to ultimately terminate the maintenance and support contract without repairing the alleged defect.

{¶ 55} Finally, Reynolds argues that individual proof would be necessary for each individual member of the class with respect to damages. While this may be true, we do not find that this is sufficient to bar class certification. Potential divergence in damages is a factor that can be considered under the predominance element, but it cannot alone prevent the court from certifying the class. *Vinci v. Am. Can Co.* (1984), 9 Ohio St.3d 98, 9 OBR 326, 459 N.E.2d 507, paragraph three

of the syllabus. This is true because no matter how individualized damages are, liability can still be tried as a class. *Lowe v. Sun Refining & Marketing Co.* (1992), 73 Ohio App.3d 563, 572, 597 N.E.2d 1189. In any event, we do not believe damage calculation in this case would require a great deal of individualized testimony. While the amount may differ for each dealership, the type of damages would be very similar across the entire class, and therefore would not create an unmanageable problem to calculate.

{¶ 56} Based on the foregoing, we find that the trial court erred in holding that the predominance element was not met for either the breach-of-contract or fraud claims. Accordingly, Carder's second assignment of error is also sustained.

## III. Superiority

{¶ 57} The final element found by the trial court to be deficient was the superiority element of Civ.R. 23(B)(3). This element requires the court to decide if a class action is a superior method of adjudication as opposed to individual lawsuits. *Schmidt v. Avco Corp.* (1984), 15 Ohio St.3d 310, 313, 15 OBR 439, 473 N.E.2d 822. Civ.R. 23(B)(3) lists four factors that should be considered when determining the superiority of a class action:

{¶ 58} "(a) [T]he interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of the class action."

{¶ 59} The key to Civ.R. 23(B)(3) "should be whether the efficiency and economy of common adjudication outweigh the difficulties and complexity of individual treatment of class members' claims." *Blumenthal v. Medina Supply Co.* (2000), 139 Ohio App.3d 283, 292, 743 N.E.2d 923.

{¶ 60} First, Reynolds argues that because Carder is the only dealership from the potential class who has brought claims against Reynolds, a class action is not appropriate. On the contrary, the Supreme Court has found that the presence of parallel actions or attempts to intervene weigh against certification, while their absence weighs in favor of certification. *Hamilton*, 82 Ohio St.3d at 81, 694 N.E.2d 442. If the opposite were true, certification would be almost impossible because the numerosity/impracticability requirement of Civ.R. 23(A)(1) and the superiority requirement of Civ.R. 23(B)(3) could not both be satisfied. Id. Therefore, the first two factors are satisfied in this case because other potential class members have not expressed interest in controlling the lawsuit, and no other actions have been initiated.

{¶ 61} In considering the desirability of the forum, the trial court found that a class action would create a hardship because potential class members all over the United States would have to travel to Montgomery County. While we recognize that members of the potential class of plaintiffs are located throughout the United States, this fact is not sufficient to warrant denial of class certification. *Simmons v. Am. Gen. Life & Acc. Ins. Co.* (2000), 140 Ohio App.3d 503, 511, 748 N.E.2d 122, citing *Sec. Benefit Life Ins. Co. v. Graham* (1991), 306 Ark. 39, 44, 810 S.W.2d 943, 945–946. Moreover, it makes sense to concentrate litigation in one location to avoid a multiplicity of lawsuits all over the country. *Blumenthal,* 139 Ohio App.3d at 297, 743 N.E.2d 923. Because we have already determined that most issues in this case are common to the entire class, travel to Ohio for litigation should be minimal. After all, the purpose of a class action is to allow one plaintiff to represent the entire class. In any event, the aggregate travel involved in conducting the class action case in Montgomery County would be far less than if each plaintiff filed an individual suit, either in its own jurisdiction or in this one.

{¶ 62} Finally, we must address the difficulties that may be encountered in managing this class action case. When addressing this factor, the trial court focused on the disparity in damages between potential class members and the need to separately address each claim. As we previously found, the overwhelming weight of authority has held that "a trial court should not dispose of a class certification solely on the basis of disparate damages." *Hamilton,* 82 Ohio St.3d at 81, 694 N.E.2d 442, citing *Ojalvo,* 12 Ohio St.3d at 232, 12 OBR 313, 466 N.E.2d 875. And again, we do not feel the damages inquiry for each plaintiff presents unmanageable problems, because the facts of this case are conducive to creating a mathematical formula for calculating damages.

{¶ 63} Reynolds also claims that because potential class members are in various states, choice of law will be different for each plaintiff. According to Reynolds, this will create chaos for the trial court determining which law applies and then possibly applying a variety of state laws. The trial court did not address this issue, but we will discuss it briefly here. We agree that the choice-of-law issue is extremely important in a class action involving potential plaintiffs from several different states. *Simmons,* 140 Ohio App.3d at 511, 748 N.E.2d 122. However, according to the evidence before us, we do not find that choice of law will present an obstacle.

{¶ 64} Concerning breach of contract, Carder has alleged that all 424 contracts expressly provide that Maryland law governs the contract. Consequently, the trial court would not need to conduct an inquiry to determine which law to apply.

{¶ 65}   Further, when courts are faced with common-law state claims such as fraud, negligent misrepresentation, and negligence, they have expressed doubts that differences in state laws are so great as to preclude class treatment.  Id. at 511, 748 N.E.2d 122, citing *In re Revco Securities Litigation* (N.D.Ohio 1992), 142 F.R.D. 659, 666.  We also doubt that the elements of a common-law fraud claim could vary greatly from state to state.

{¶ 66}   Moreover, a conflict-of-law issue only arises if there is an actual conflict between the law of the forum state and the law of another jurisdiction. *Cross v. Carnes* (1998), 132 Ohio App.3d 157, 168, 724 N.E.2d 828, citing *Akro–Plastics v. Drake Industries* (1996), 115 Ohio App.3d 221, 224, 685 N.E.2d 246. The burden of proving this conflict rests with the party disputing the application of local law.  Id. Carder has agreed that Ohio law should apply to its fraud claims.  Reynolds, on the other hand, has not cited any authority indicating that the laws of other states differ from the law of Ohio in a common-law fraud claim.

{¶ 67}   Finally, we believe that the law of Ohio would appropriately be applied to the fraud claims alleged in this case.  The Restatement of Law 2d, Conflict of Laws, Section 148(2), lists several factors to be considered when determining which state law should apply to a fraud claim.  The factors relevant to our inquiry are (1) the place where plaintiff acted in reliance on defendant's representations, (2) the place where plaintiff received the representation, (3) the place where defendant made the representation, and (4) the place of business of the parties.  When considering these factors, we note that either the law in the state of plaintiffs' or defendant's place of business could be appropriate.  However, the Restatement later explains that after applying these factors, if more than one factor applies to one state, that state's law is the better choice.  Considering also that Ohio is the forum state, Ohio law would be an appropriate choice of law to make.

{¶ 68}   Furthermore, we do not agree with Reynolds's assertion that the trial court would be required to conduct 424 minitrials because of the individualized issues in this case.  The breach of contract alleged is an identical breach of identical language in 424 contracts.  This issue can be resolved for the entire class at one time.  In addition, the two fraud claims are each based on identical documents sent to the 424 plaintiffs.  One document is alleged to contain a misrepresentation, where the other is alleged to have alerted the plaintiffs to an omission.  These questions do not appear to create insurmountable problems in handling this case as a class action.

{¶ 69}   Resolving all of the claims alleged together in one forum would eliminate the danger of varying or inconsistent judgments and would allow "for the vindication of rights of groups of people who individually would be without effective strength to litigate their claims."  *Cope*, 82 Ohio St.3d at 431, 696

N.E.2d 1001. We recognize that the class members involved herein are businesses and could each potentially bring individual actions against Reynolds. See *Liberty Lincoln Mercury v. Ford Mktg. Corp.* (D.N.J.1993), 149 F.R.D. 65, 74. However, the cost of such litigation would likely outweigh the potential judgments to be received by each dealership. See *Larry James Oldsmobile–Pontiac–GMC Truck Co., Inc. v. Gen. Motors Corp.* (N.D.Miss.1996), 164 F.R.D. 428 (allowing class treatment for class of automobile dealerships); Cf. *Auto Ventures, Inc. v. Moran* (S.D.Fla.1997), 1997–1 Trade Cases P 71,779, 11 Fla.L.Weekly Fed. D 3, at 2, 1997 WL 306895 (finding that because each dealership was claiming millions of dollars in damages, class treatment was not necessary). Accordingly, this case appears to be entirely appropriate for treatment as a class action, and Carder's third assignment of error is sustained.

{¶ 70} On a final note, if after further discovery, the trial court determines that the facts are not as they have been presented to this court, the trial court may possibly decertify the class. See, e.g., *Blumenthal v. Medina Supply Co.* (1995), 100 Ohio App.3d 473, 475, 654 N.E.2d 368; *Deegan & McGarry v. Med–Cor* (1998), 125 Ohio App.3d 449, 453, 708 N.E.2d 1029.

{¶ 71} Based on the foregoing discussion, all of Carder's assignments of error are sustained. We find that the trial court abused its discretion in denying class certification in this situation where all of the elements of Civ.R. 23 have been satisfied and the claims are appropriate for class certification. The trial court's judgment denying class certification is reversed, and this cause is remanded for further proceedings consistent with our opinion.

Judgment reversed
and cause remanded.

WOLFF, P.J., and FAIN, J., concur.