NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0018n.06

No. 13-3209

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

MATTHEW B. FRISCH and
THE FRISCH AGENCY, LLC,

     Plaintiffs-Appellants,

v.

NATIONWIDE MUTUAL INSURANCE CO.
and NATIONWIDE BANK,

     Defendants-Appellees.

                                /

**FILED**
Jan 14, 2014
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO

BEFORE:  BOGGS, CLAY, and GILMAN, Circuit Judges.

**CLAY, Circuit Judge.**  Plaintiff, Matthew Frisch, sued Defendant, Nationwide Mutual Insurance Co., for breach of contract, fraud, and breach of the implied covenant of good faith and fair dealing. The district court dismissed Plaintiff's second and third claims under Federal Rule of Civil Procedure 12(b)(6).  Subsequently, the district court granted summary judgment to Defendant on Plaintiff's first claim for breach of contract.  For the reasons that follow, we **AFFIRM** the district court's grant of summary judgment to Defendant on Plaintiff's breach of contract claim and the district court's dismissal of the additional two claims.

## BACKGROUND

Plaintiff is an insurance agent who was recruited by Defendant in 2005 to become a "career exclusive agent." On September 1, 2005, Plaintiff and Defendant entered into two contracts. The first contract, entitled the Agency Executive Agreement ("AE"), set out production requirements for Plaintiff to meet over a three-year production period. The second contract, entitled the Independent Contractor Agent's Agreement ("IC"), set out the terms of the relationship between the two parties. The IC established that Plaintiff was an "independent contractor" and that the contract could be terminated by either party upon notice to the other, "with or without cause." Concurrent with the execution of these contracts, Plaintiff took out a $250,000 loan from Nationwide Federal Credit Union, which was the predecessor of Nationwide Bank.

At the time, Plaintiff believed that his minimum production requirement for the three-year period was $937,500 in "direct written premiums" on Defendant's "Property/Casualty" policies ("P&C DWPs"). If he were to meet this target, he would have successfully completed the program and he would receive a waiver of 50% of the balance on his loan.

In the middle of 2006, however, Defendant presented Plaintiff and others in the Exclusive Agent Program with a choice: they could either withdraw from the program and turn over their business books to Defendant, or enter into a Modified AE ("MAE") under which Plaintiff claimed he was "designed for failure." Plaintiff chose the second option. On January 26, 2007, Plaintiff signed a Memorandum of Understanding ("MOU") under which he was to receive $15,000 in cash and $35,000 in reimbursement for business expenses. The MOU also contained a release that would "completely release and forever discharge any and all claims which [Plaintiff] may have against

2

[Defendant], its affiliates, subsidiaries, successors and assigns, whether known or unknown, which were or could have been asserted against [Defendant] from the beginning of time until the date of [the] MOU." Defendant presented the MAE to Plaintiff, who signed it on May 15, 2008.

Under the MAE, Plaintiff became eligible for a $170,000 capital infusion. Additionally, the MAE altered the minimum production requirements and production period to which he was subject. The minimum production requirements were altered to require that Plaintiff sell a certain amount of P&C DWPs and life insurance policies based on how many months he had been in the contractual relationship with Defendant. For example, after 39 months with Defendant, the MAE required that Plaintiff achieve $829,487 in P&C DWP sales and 36 sales of life insurance policies ("life sales"). The former were to be measured on a "12 month moving basis" and the latter were to be measured monthly, with Plaintiff meeting life sales targets each quarter until he achieved the cumulative life sales requirement for that year. While the MAE provided for two possible methods for terminating the relationship, the one relevant method on appeal was as follows:

> [If] (a) Agent successfully meets the requirements of the Modified Minimum Production Plan as of the six-month anniversary of the Effective Date of [the] Agreement, but then (b) fails to meet the requirements of the Modified Minimum Production Plan for two successive quarters thereafter, the Agent's relationship with [Defendant] shall be terminated and this Agreement and Agent's IC Agreement shall be canceled.

During the first six months following the introduction of the MAE, Plaintiff successfully met his minimum production requirements. However, he subsequently began to fall behind the plan's requirements in increasingly larger increments after the six-month anniversary of the execution of the MAE. In his first quarter after the six-month anniversary, Plaintiff met his life sales requirement, but he narrowly missed his $829,487 sales requirement for P&C DWPs. Later, in the second quarter

following his six-month anniversary, Plaintiff trailed even further behind his contractual performance requirements. During that quarter, Plaintiff met neither his life sales requirement nor his P&C DWP requirement. Moreover, he failed to meet his monthly goals for March, April, and May of 2009.

Plaintiff alleged that, beginning in November 2008, Defendant began pressuring Plaintiff to terminate their relationship. Allegedly, Defendant offered to waive the balance of Plaintiff's loan if he agreed to a termination prior to January 15, 2009. Plaintiff alleged that when he rejected the offer to terminate the relationship, Defendant retaliated against him by intentionally miscalculating his P&C DWPs for February 2009. On March 30, 2009, Defendant placed Plaintiff on probation in response to his production shortfalls. According to Plaintiff, the pressure to leave increased after he was placed on probation. Eventually, on September 4, 2009, Plaintiff received a letter from Defendant notifying him that he was terminated based on his inability to meet program requirements.

With respect to Plaintiff's fraud claim, he alleges misrepresentations in December 2006, January 2007, and March 2007. Specifically, in December 2006, Defendant's executives told a group of agents assembled at a hotel in Harrisburg, Pennsylvania, including Plaintiff, that the minimum production requirements embodied in the original AE were being reexamined to fix certain problems that had arisen. On January 26, 2007, Defendant's Eastern Pennsylvania Regional Sales Officer told Plaintiff during a meeting in Conshohocken, Pennsylvania, that the AE Program would be terminated and replaced by an improved Modified AE Program and that anyone who wanted to continue his relationship with Defendant would have to accept the MAE and become

subject to its altered requirements. Finally, in March 2007, another employee of Defendant told Plaintiff and others in Lewis Center, Ohio, that the MAE's altered minimum requirements would be more realistic and that all who signed onto the MAE would be subject to a six-year $1.8 million production requirement. Plaintiff's fraud claim also rests on his allegation that Defendant failed to share additional relevant information during their December 2006 and March 2007 encounters. In particular, he alleges that Defendant failed to disclose its intention to significantly reduce the number of career exclusive agents in the Program.

Plaintiff filed this diversity suit in the United States District Court for the Southern District of Ohio on May 14, 2012, listing three claims against Defendant in his complaint: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) fraud. Defendant moved to dismiss all of these claims under Federal Rule of Civil Procedure 12(b)(6), which the district court granted in part and denied in part. The district court dismissed Count 2 because under Ohio law, a breach of the covenant of good faith and fair dealing cannot be recognized as a claim separate and apart from a claim for breach of contract. The court dismissed Count 3 on statute of limitations grounds because Ohio's borrowing statute required application of Pennsylvania's two-year statute of limitations, which had already expired by the time Plaintiff's complaint was filed.

Count 1 for breach of contract survived the motion to dismiss. On cross-motions for summary judgment, however, the district court granted summary judgment to Defendant, finding that Plaintiff failed to meet his monthly and quarterly requirements. Therefore, the district court found that Defendant was within its rights to terminate its relationship with Plaintiff and did not breach the contract by doing so.

**DISCUSSION**

I.   **Plaintiff's Breach of Contract Claim**

  A.   **Standard of Review**

This Court reviews a district court's grant or denial of summary judgment *de novo*, "applying the same standards as the district court." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013). "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, 'show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.'" *Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 324 (6th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).

  B.   **Analysis**

The MAE stipulated that Defendant could terminate its relationship with Plaintiff if he failed to meet production plan requirements for two successive quarters following his six-month anniversary. The minimum production requirements laid out in the MAE mandated that Plaintiff sell a certain dollar amount of P&C DWPs as well as a certain number of life sales on a monthly basis, based on how many months he had been with Defendant at a given point in time. On summary judgment, Defendant produced unrefuted evidence that, beginning in December 2008, which was the first month following his successful six-month period, Plaintiff never met both his monthly P&C DWPs and life sales requirements in a given month. In the two months marking the ends of the first and second quarters after his first successful six-month period, February 2009 and May 2009, respectively, Plaintiff failed to meet his minimum production requirements. In February

6

2009, Plaintiff met his life sales requirement, but he fell slightly short of the P&C DWP requirement, reaching 99.63%. In May 2009, Plaintiff's performance had fallen to 90.48% of life sales and 93.41% of P&C DWP sales requirements.

Plaintiff offered no evidence at summary judgment to refute Defendant's figures, and he only argues in his brief that the life sales requirement was ambiguous as to whether it would be measured monthly or quarterly. He argued that if the figure were to be measured monthly, Defendant would not have been able to show that Plaintiff had missed his life sales goals for six straight months. But this argument misses the fact that P&C DWPs were indisputably to be measured on a "12-month moving basis" and that in February 2009, upon the end of the first quarter after his first six-month period, Plaintiff fell about $3,000 short of the P&C DWP requirement. Under the MAE, if Plaintiff failed to meet either (or both) of his minimum production requirements in February 2009 and May 2009 (or May 2009 and August 2009 or any two successive quarters), then Defendant unambiguously had the right to terminate Plaintiff under their contract.

Therefore, the district court properly granted summary judgment to Defendant on Plaintiff's breach of contract claim because Plaintiff failed to meet his production requirements under the MAE.

## II. Plaintiff's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

### A. Standard of Review

This Court reviews *de novo* a district court's dismissal of a claim under Federal Rule of Civil Procedure 12(b)(6). *Conlin v. MERS*, 714 F.3d 355, 358 (6th Cir. 2013).

> Following *Twombly* and *Iqbal*, it is well settled that a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is *plausible*

on its face. A claim is plausible on its face if the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

*Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011) (internal citations and quotation marks omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In ruling on a motion to dismiss, this Court "may consider [only] the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008).

## B.    Analysis

Where, as here, federal jurisdiction is based on diversity, this Court applies the substantive law of the forum state. *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). In this case, Ohio's substantive law applies. In resolving issues of Ohio law, this Court looks to "the final decisions of [the] state's highest court, and if there is no decision directly on point, then we must make an *Erie* guess to determine how that court, if presented with the issue, would resolve it." *Conlin*, 714 F.3d at 358–59. In making this determination, the decisions of the Ohio Court of Appeals are viewed as "persuasive unless it is shown that the [Ohio Supreme Court] would decide the issue differently." *Id.* at 359.

Defendant correctly notes, as did the district court, that Ohio law does not recognize a stand-alone claim for breach of the implied covenant of good faith and fair dealing. *Wendy's Int'l, Inc. v. Saverin*, 337 F. App'x 471, 476 (6th Cir. 2009) ("[T]he duty does not create an independent basis

8

for a cause of action."); *Lakota Local Sch. Dist. Bd. of Educ. v. Brickner*, 671 N.E.2d 578, 584 (Ohio Ct. App. 1996) ("[Our cases do not] stand[] for the proposition that a breach of good faith exists as a separate cause of action from a breach of contract claim. Instead, they recognize the fact that good faith is part of a contract claim and does not stand alone."). Although Ohio law does recognize that "every contract contain[s] an implied duty for the parties to act in good faith and to deal fairly with each other," *Littlejohn v. Parrish*, 839 N.E.2d 49, 54 (Ohio Ct. App. 2005), this duty "is part of a [breach of] contract claim and does not stand alone." *Lakota*, 671 N.E2d at 584.

For the purposes of this claim, the relevant contract that was arguably breached was the AE. The allegations demonstrate that Plaintiff does not have a viable claim for breach of the AE. The parties were under an existing contract (the AE) when Defendant asked to modify that contract. Plaintiff, apparently thinking that modification was the only course available to him, elected to modify that contract (as reflected in the MAE) for adequate consideration. *See GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 813–14 (6th Cir. 1999) ("It is axiomatic that any modification of a contract must be supported by both mutual consent and consideration." (internal citations and quotation marks omitted)); *Trader v. People Working Cooperatively, Inc.*, 663 N.E.2d 335, 337 (Ohio Ct. App. 1994) ("As a general matter, for a modification to a contract to be binding, it must be supported by consideration."). Now that his modified contract has proved disadvantageous, Plaintiff seeks to sue for breach of an implied duty from the original contract. Having accepted the modification and with no basis to now challenge the validity of that modification, Plaintiff cannot sustain a claim for breach of the unmodified AE because the modified terms govern the parties' contractual relationship. *See Sheet Metal Workers Nat'l Pension Fund v. Bryden House Ltd. P'ship*,

719 N.E.2d 646, 652 (Ohio Ct. App. 1998) ("[I]n order to establish economic duress, the party must show that it was subjected to a wrongful or unlawful act or threat that deprived the party of its unfettered will."); *Sites v. Moore*, 607 N.E.2d 1114, 1118 (Ohio Ct. App. 1992) ("When the terms of a contract are contradictory, the terms added later supersede the original terms to the extent of the contradiction.").

If Plaintiff did not like the terms of the MAE, he should have declined to execute it, and if Defendant refused to continue performing under the AE, sued for breach of contract at that time. *See* 3 Williston on Contracts § 7:37 (4th ed.) ("[U]nder ordinary contracts the promisor's duty is to perform the contract, and the promisee is entitled to the bargained-for performance."). Plaintiff's assent to the MAE, which was supported by consideration, dooms his claim for breach of the implied covenant of good faith and fair dealing with respect to the AE. *See Pannozzo v. Anthem Blue Cross & Blue Shield*, 787 N.E.2d 91, 98–99 (Ohio Ct. App. 2003) (affirming the dismissal of a claim for breach of the implied covenant of good faith and fair dealing where a doctor challenged the nonrenewal of terms in an expired contract while working under a new contract); *see also Thomasville Furniture Indus., Inc. v. JGR, Inc.*, 3 F. App'x 467, 472 (6th Cir. 2001) (Clay, J.) (The "implied covenant of good faith and fair dealing . . . [is] not [] a basis for a cause of action.") (citing *Bolling v. Clevepak Corp.*, 484 N.E.2d 1367, 1376 (Ohio Ct. App. 1984)).

The district court did not err in dismissing Plaintiff's claim for breach of the implied covenant of good faith and fair dealing because such a claim cannot stand separate and apart from the claim for breach of the underlying contract.

III.    **Plaintiff's Fraud Claim**

The central dispute regarding Plaintiff's fraud claim is which state's statute of limitations should be applied. Defendant contends that Pennsylvania's two-year statute of limitations applies, while Plaintiff asserts that Ohio's four-year statute of limitations applies. The district court held that Pennsylvania's statute of limitations applied by operation of Ohio's borrowing statute.

"Ordinarily, under Ohio law, 'a cause of action accrues and the statute of limitations begins to run at the time the wrongful act was committed.'" *Metz v. Unizan Bank*, 649 F.3d 492, 497 (6th Cir. 2011) (quoting *Collins v. Sotka*, 692 N.E.2d 581, 582 (Ohio 1998)). At first blush, it would seem that, regardless of whether the two-year or four-year statute of limitations applies, the claim is barred because the May 2012 filing date was more than five years after the alleged misrepresentations in December 2006 in Pennsylvania, January 2007 in Pennsylvania, and March 2007 in Ohio. However, this general rule is subject to the discovery rule, an exception that is especially relevant in the context of fraud claims. *State ex rel. Lien v. House*, 58 N.E.2d 675, 678 (Ohio 1944). Under this exception, "[a] cause of action for fraud . . . accrues either when the fraud is discovered, or [when] in the exercise of reasonable diligence, the fraud should have been discovered." *Cundall v. U.S. Bank*, 909 N.E.2d 1244, 1250 (Ohio 2009). In this case, Plaintiff did not plead when he discovered the fraud, but the district court found that the latest possible accrual date occurred when Defendant terminated the MAE and IC in September 2009. Therefore, the May 2012 filing date occurred less than four years after the possible accrual date, making the choice of which state's statute of limitations to apply an important one.

The MAE contains a choice-of-law provision that selects Ohio law "regardless of any conflicts of law provision requiring reference to the rules of, decision in, and/or laws of another state

or sovereign nation." However, as the district court acknowledged, this Circuit has held that "contractual choice-of-law clauses incorporate only substantive law, not procedural provisions such as statutes of limitations." *Cole v. Mileti*, 133 F.3d 433, 437 (6th Cir. 1998) (citing *Phelps v. McClellan*, 30 F.3d 658, 662 (6th Cir. 1994); *Charash v. Oberlin Coll.*, 14 F.3d 291, 299 (6th Cir. 1994)). This rule is not absolute; it merely provides the background rule around which parties can contract with "an express statement that the parties intended another state's limitations statute to apply." *Id*. at 437. Without such an express statement, "the procedural law of the forum governs time restrictions on an action." *Id*.

Applying Ohio law does not, however, give the Plaintiff the result that he desires, due to Ohio's borrowing statute, which provides:

> No civil action that is based upon a cause of action that accrued in any other state, territory, district, or foreign jurisdiction may be commenced and maintained in this state if the period of limitation that applies to that action under the laws of that other state, territory, district, or foreign jurisdiction has expired or the period of limitation that applies to that action under the laws of this state has expired.

Ohio Rev. Code § 2305.03(B). Therefore, the question becomes where Plaintiff's claim for fraud accrued. If the claim accrued in Pennsylvania, then Pennsylvania's two-year statute of limitations would apply (by operation of Ohio's borrowing statute), barring Plaintiff's claim. However, if it accrued in Ohio, the four-year statute of limitations would apply and Plaintiff could proceed with his claim.

Although neither the borrowing statute nor Ohio case law offers a "definitive answer" for determining the place of accrual, Ohio courts have recognized that "'the elements of time and place of accrual are inextricably intertwined: The time when a cause of action arises and the place where

it arises are necessarily connected, since the same act is the critical event in each instance.'" *Jarvis v. First Resolution Mgmt. Corp.*, 983 N.E.2d 380, 386 (Ohio Ct. App. 2012) (quoting *Swanson v. Wilson*, 423 F. App'x 587, 593 (6th Cir. 2011)). In determining where a claim accrues, Ohio courts have looked to the principles outlined in the Restatement (Second) of Conflict of Laws (1971). *Id.* at 386–87. For fraud claims, the Restatement lists several factors to consider: "(1) the place where plaintiff acted in reliance on defendant's representations, (2) the place where plaintiff received the representation, (3) the place where defendant made the representation, and (4) the place of business of the parties." *Carder Buick-Olds Co. v. Reynolds & Reynolds, Inc.*, 775 N.E.2d 531, 544 (Ohio Ct. App. 2002) (citing §148(2) of the Restatement).

All three of Plaintiff's subclaims regarding fraudulent activity on December 2006, January 2007, and March 2007 accrued in Pennsylvania. The alleged December 2006 and January 2007 misrepresentations were made and received in Pennsylvania, and that is also where Plaintiff acted in reliance upon them when he signed the MAE. Further, the discovery of the fraud, which is the operative date of accrual under Ohio law, occurred in Pennsylvania. This analysis is substantially similar with respect to the March 2007 incident. Even though the misrepresentation was made and received in Ohio, Plaintiff's reliance and discovery occurred in Pennsylvania, which is a relevant factor for determining which state has a more significant relationship to the fraud. Therefore, because the Ohio borrowing statute directs courts to apply the limitations period of the state where the action accrued, and because Plaintiff's fraud claim accrued in Pennsylvania, notwithstanding the fact that the March 2007 alleged misrepresentation was made in Ohio, Plaintiff's claim is time-barred under Pennsylvania's two-year statute of limitations.

Therefore, the district court did not err in dismissing Plaintiff's fraud claim.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's dismissal of Counts 2 and 3 and grant of summary judgment on Count 1 in favor of Defendant.